UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Laurel Beeler, Magistrate Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
vs.                            )   No. CR 24-00096-LB-1
                               )
MARCUS B. FREEMAN,             )
                               )
          Defendant.           )
_____)


                                   San Francisco, California
                                   Thursday, December 4, 2025

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
            RECORDING 10:50 - 11:45 = 55 MINUTES


APPEARANCES:

For Plaintiff:
                         United States Attorneys Office
                           Department of Justice
                         450 Golden Gate Avenue
                         Floor 11
                         San Francisco, California
                           94102
                    BY:  MICHAEL J. G. LAGRAMA, ESQ.

For Defendant:
                         Tamara Crepet Law
                         Pier 9
                         Suite 100
                         San Francisco, California
                           94111
                    BY:  TAMARA A. CREPET, ESQ.

2

Transcribed by:                Echo Reporting, Inc.
                               Contracted Court Reporter/
                               Transcriber
                               echoreporting@yahoo.com

3

<u>Thursday, December 4, 2025</u>                              <u>10:50 a.m.</u>

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK:  Calling criminal action 24-96, USA versus Marcus Freeman.

Counsel, can you please state your appearances for the record?

MR. LAGRAMA:  Good morning, your Honor.  Michael Lagrama for the United States.

MS. CREPET:  Good morning.  Tamara Crepet on behalf of Marcus Freeman who is present and out of custody.

THE COURT:  Okay.  Good morning, everybody.

Do I have anybody here from Probation or Pretrial?  It's fine.  It doesn't need to be that way, but I know that Probation sent the normal scripts.  So I'm going to wait for Elaine to give that to me so we don't have to (indiscernible) during the hearing.

MS. CREPET:  Well, we're in touch with Officer Mansia (phonetic).

THE COURT:  Okay.  That's all right.  It's just they -- there's just a (indiscernible) procedural process.

MR. LAGRAMA:  Your Honor, is Alex Reimer (phonetic) on Zoom?

THE COURT:  Yeah, and so we have on the Zoom -- maybe you could just state your appearance for the record.

4

MR. REIMER (via Zoom):  Hi.  (Indiscernible).

THE COURT:  Okay.  Great.  Thank you for being here.  And so just bear with us for a second while we get ourselves oriented.

And, Elaine, I thought you said that we had something from Probation.

THE CLERK:  Oh, I see.  It was the (indiscernible).

THE COURT:  I don't have that.  No worries.  I mean, I know you gave it to me before.  I just don't have it now.

MR. LAGRAMA:  We didn't get any -- we didn't get any either, your Honor.

THE COURT:  That's all right.  Elaine will produce more copies, and I'll just look (indiscernible).

Oddly, the back and forth between Zoom, hybrid, in-person, your file is somewhere in the pile, simple things back there.  And it's all beautifully organized by Elaine as of, like, a week ago in my crim box.  Then we moved binder yesterday to my conference table, picked up by me today before coming in, and then sorted into oblivion as soon as I entered the courtroom, because just the whole back and forth, and you kind of miss the issues that attend this hybrid process.

So how's everybody been?  It's been a while.

MR. LAGRAMA:  Been doing well.

MS. CREPET:  It's so nice to be here.  It's nice to see you.

THE COURT:  Yes.  It's nice to see everybody too. And I appreciate that you're being available on the Zoom.  I know this is -- I'll just say a couple of words about the process.  You know, it's -- I'm glad you're here.  You have a right to be here, but it's important to have folks in all kinds of cases.  I don't know how early or on the Zoom, but we're here in federal court.  We have a lot of different cases, and it's probably -- every case, whether it's civil or criminal, is a difficult case for everybody.  And one of the important things sometimes is we come together -- we come together in a room -- a courtroom or a virtual room that includes Zoom, and it's important that everybody in the room has a voice.  And we often forget that because the judge and the lawyers do an awful lot of the talking.  And the context of everything that goes on in a courtroom from a community perspective from every -- from the party perspective is important.  So I appreciate everybody's participation in the process and know it's not easy.  And it's one of the great things about our court system is that -- I always say if people could see what we do day in, day out, they would have maybe more confidence in the system. It's not perfect.  It doesn't always work in a way that

6

feels like justice to people who are part of the process. And we do our best.  And today's process is part of that. So I really do appreciate everybody's being here.

What we're going to do today is we're going to start with an entry of plea.  The parties are here today.  There has already been an arraignment on the information, and I really appreciate how Ms. Crepet has -- of bringing the extra copies.  We -- the case is on now for an entry of plea on the information that was filed in February of 2024.  I have here a copy of the plea agreement.  I guess what I need, perhaps, is a signed copy of the plea agreement so we could swap.

MS. CREPET:  Mr. Lagrama contributed to those copies as well.  It was a joint effort.

THE COURT:  Okay.  Thank you.  Of course.

Okay.  So I have here a copy of the plea agreement. And you're -- you understand, Mr. Freeman, that you're here today to enter a guilty plea.  Is that correct?

THE DEFENDANT:  Yes.

THE COURT:  And before you -- I know Ms. Crepet told you about that.  Because you're going to plead guilty, I have to advise you of certain rights before you plead guilty.  Because you have to answer questions about the guilty plea, we have to put you under oath.  So I'm going to ask Ms. Kabiling to do that.

7

THE CLERK:  Please raise your hand.

MARCUS B. FREEMAN - DEFENDANT - SWORN

THE CLERK:  Great.

THE COURT:  All right.  And so the first thing we do is -- one of the issues is that we have to make sure a guilty plea is voluntary, so I ask you some questions to illuminate that process.

So why don't you tell me your name for the record, just a little bit about you, such as what do you do, how do you occupy your time?

THE DEFENDANT:  My name Marcus Freeman.  I'm into, like, arts and studio stuff.  And, right now, I'm kind of doing schooling online, and I'm about to start working for (indiscernible) out in Walnut Creek.  I'm a full-time father, and I also help with the community, feeding the homeless and little things like that.

THE COURT:  Okay.  So it sounds -- so it sounds like you have a full and busy life.

THE DEFENDANT:  Yes.

THE COURT:  Thank you for telling me a little bit about that.

Is there -- and, again, these are all questions we ask everybody to make sure that they understand what's happening and can -- and plead guilty voluntarily.

Have you been treated recently for any mental illness

8

or substance abuse of any kind?

THE DEFENDANT:  No, your Honor.

THE COURT:  Are you currently under the influence of any drug, medication, or alcohol?

THE DEFENDANT:  No, your Honor.

THE COURT:  Is there anything about today's -- today that would make it difficult for you to understand the proceedings or to participate in them?

THE DEFENDANT:  No, I don't think --

THE COURT:  Okay.  Did you read and fully discuss the charges, your decision to plead guilty, and the case in general with Ms. Crepet?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Are you satisfied with the counsel representation and advice that she's given to you?

THE DEFENDANT:  Yes.

THE COURT:  We have your plea agreement, which is disclosed in open court.  This is the disclosure.  And so you read and discussed the entire plea agreement with Ms. Crepet before you signed it?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  And does the plea agreement represent the entire agreement that you have with the Government about your case?

THE DEFENDANT:  Yes, your Honor.

9

THE COURT:  Did anyone try to threaten you to plead guilty or make you any promise that's not in the plea agreement?

THE DEFENDANT:  No.

THE COURT:  Okay.  So this is an agreement -- a B agreement.  The parties have agreed to recommend a sentence that's set forth in the plea agreement, which is a probationary period of one year.  Do you understand that this is merely a recommendation to the Court that I can reject and that the parties' sentencing recommendations aren't binding on me?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  And so if I decide to do something different, including doing something that's more severe, you couldn't withdraw your guilty plea if I decided to do that.  Do you understand that?

THE DEFENDANT:  Yeah.

THE COURT:  Okay.  So you are pleading guilty in the plea agreement to count one of the information charging you with failure to report a motor vehicle accident in violation of the CFR.  We -- the elements of the case are that you were operating a motor vehicle that was involved in an accident on federal land and that's within the jurisdiction of the United States.  That's why you're in federal court.  The accident resulted in property damage,

10

personal injury, or death.  And, three, that you failed to report the accident within 24 hours to the police, the park police, park rangers, or other designee of the Superintendent of the Golden Gate National Recreation Area. So those are the elements of the case.

The penalties are up to six months.  It's a -- by the Code of Federal Regulations that applies to the Presidio, essentially, the GGNRA.  The maximum term of prison is up to six months or up to five years probation, a fine of up to $5,000.  There's a mandatory special assessment fee of $10.

So do you understand the elements of the charge that you're pleading guilty to and what the potential penalties might be?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  The plea agreement -- also, by pleading guilty, you are giving up certain appeal rights. You can't appeal the sentence, the conviction, the judgment, any orders of the Court, except for a claim of ineffective assistance of counsel, or that the sentence basically is unconstitutional because it exceeds the statute maximum. And so by pleading guilty today, you understand that you're giving up those important appeal rights, including the ability to do something called collaterally attack your sentence -- there's appeal, and then other ways of attacking your sentence and conviction -- except for any claim of

11

ineffective assistance of counsel or an illegal sentence. Do you understand --

THE DEFENDANT:  Yeah.

THE COURT:  -- that you're giving up those appeal rights?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  You're also giving up certain trial rights.  You have the right to plead not guilty and to persist in that plea.  You've already pleaded not guilty. You have a right to a bench trial where you would be presumed innocent.  The Government would have to prove guilt beyond a reasonable doubt.  You'll continue to have the right of assistance to your attorney, Ms. Crepet, appointed -- who was appointed by the Court -- at every stage of the trial, in court and out of court.  You would have the right at trial to confront and cross examine the adverse witnesses that were -- that the Government put up against you to -- you wouldn't have to -- no one can compel you to testify, so you have the right not to testify.  You could also testify if you wanted to, present evidence, compel the attendance of witnesses, and that by -- and the key point here is that by pleading guilty here today, you're giving up all of those important trial rights.  Do you understand that?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  The factual basis -- the factual basis

12

in the plea agreement, which I'm just going to put on the record, is that on April 30th, 2022, at about 7:11 p.m. in San Francisco, you were driving a blue Toyota car, you turned off Old Mason Street into (indiscernible) Street at Crissy Field East Beach, and there you were involved in an accident with a bicyclist who suffered physical injuries and damage to his bicycle.  And then this accident occurred in the Golden Gate National Recreation Area, which is federal land within the exclusive jurisdiction of the United States. The fact reported in the plea agreement is that you did not report the accident within 24 hours to the police, the park police, the park rangers, or any other designee of the Superintendent of the Golden Gate National Recreation Area.

     Do you agree that the Government could prove those facts at trial?

          THE DEFENDANT:  Yes, your Honor.

          THE COURT:  All right.  I'll find that there's a factual basis for a guilty plea.

     And so I think -- well, so this is -- and I'm sorry that I have to ask again.  Remind me of the victim's name.

          MR. LAGRAMA:  Alex Reimer.  Alexander Reimer.

          THE COURT:  So, Mr. Reimer, I guess it's -- we talked a little bit.  And I'm going to try to look at the camera so it's not too odd.  You have the right to speak. You can speak now before the entry of plea.  Normally, what

13

happens is that we do an entry of plea.  I ask somebody if they're guilty or not guilty, and then they -- this is going to be a guilty plea, so there will be not guilty plea.  Then we'll -- we would proceed to sentencing.  So you can talk now before the entry of plea, or you could talk after.  It's whatever you want to do.  I assume by talking with the Government right before we did the entry of guilty plea that you would probably talk before sentencing, but it's actually completely up to you.  You can talk anytime you want.  You have that right, and we welcome your remarks.  Do you have a preference?  Because the main thing, probably, is the sentence, but I don't know.  You tell me what you would like to do.

MR. REIMER:  I would like to talk before sentencing --

THE COURT:  Okay, perfect.  So we'll do the entry of guilty plea, and then we'll move on to the sentencing where we have other processes that we go through, and we'll put in a time for you to talk.

MR. REIMER:  I'm sorry, can I (indiscernible) that?  Is it possible to talk now?

THE COURT:  Sure.  Yes, 100-percent.

MR. REIMER:  Okay.  Then I would like to talk about the accident and my stance in this accident.

THE COURT:  Okay, that's --

14

MR. REIMER:  And so what I would like to make clear here is that I wasn't (indiscernible).  I was in the protected bike lane that was to the side of the car.  And I know he saw me because I connected eyes with him.  I was going -- his car was going way too fast, and there's no way he's going to (indiscernible).  I always (indiscernible).  Suddenly, Marcus turns into the parking lot, crossing this protected bike lane, and I know I'm going to hit the car, so I do everything I can to brace, and I collide with Marcus.  After I collide with him, I am on the ground, I am bleeding.  Marcus rolls down his window, and he goes, "You hit me."  The car smelled of marijuana.  His eyes were bloodshot red.  His mother later told the NPS detective that he was under the influence of marijuana.  While I'm bleeding on the ground, I tell him not to move his car because I know he's going to drive away.  Instead, he drives off, nearly running me over (indiscernible) within basically a sidewalk.  And at this point, I'm screaming, "Get the plates.  Get the plates."  I spend two nights in the SF General ICU.  My hospital bills were over $75,000.  SF General was going to put a lien on me for that full amount.  I had to pay a lawyer over $10,000 to negotiate with them.  Again, the victim has to pay.  This doesn't make sense.

I was informed that my heart condition is likely permanent and can affect me later on in life.  I've had

15

heart pain for over a year after the accident, and I still have a occasional (indiscernible).

It turns out Marcus was in a rental car.  The car was rented by his mother because he cannot rent cars due to his previous convictions.  To cover up the crime and the damage to the car, he reported it stolen (indiscernible).  There's no insurance anywhere, neither from Marcus nor his mother, and they did not take insurance when renting the car.  Later, after Marcus was caught, he admitted to the NPS detective that he used his car as a weapon on purpose to teach me a lesson, that I, as a cyclist who had the right of way, needed to be taught a lesson.  I've also been informed that Marcus has been registering his car every year while out on prob.  This likely means he's driving around unlicensed and uninsured.  Afterwards, I started getting calls from a number threatening to run me over.  This was likely Marcus calling.  These calls went on for two years.  They finally stopped when I said, "Marcus, I know this is you.  I'm recording these calls."

I've also been informed that internally, Lagrama has been blaming me for the accident while I had the right of way in a protected bike lane.  In my conversation with Lagrama, he is defending Marcus' actions.  The prosecutor in this case is defending the Defendant and blaming the victim.  I'm not a lawyer, but, in my understanding, this is not the

16

way the law is supposed to work. And this is crazy from a prosecutor's office that has come under national attention in the case of Ethan Boyes and -- where he got murdered by a drunk driver, and this office handed out this sham (indiscernible) plea bargain, where nothing happened to the murderer of Ethan Boyes, who was a friend of mine. And this office is saying it is okay for people to hit cyclists and claim -- and just continue on and face no consequences.

If this plea bargain is approved, I no longer see why I should bother follow the law, because I know -- I see no repercussions for people's actions. This case has taken two and a half years, and I find out there's no -- there's effectively no punishment and not (indiscernible), and I won't even get money to cover my bills.

The first prosecutor on the case, Hillary, told me that she didn't really care about this case because she sees it as at street-level crime. That's (indiscernible). But even she said, Marcus (indiscernible) -- that Marcus (indiscernible) for his actions.

I'm also going to be filing a (indiscernible) complaint against Lagrama and his actions. Does Lagrama's office have a code of ethics? Because if it does, I assume that blaming the victim and defending the Defendant would certainly be violating the code of ethics.

You know, Marcus is a multi-time offender. He's

17

previously been convicted of several Schedule I drugs and stealing cars.  With this plea bargain, a failure to report an accident, which is basically a fender bender on a McDonald's car parking lot, you're giving him permission to continue on his intentional and dangerous actions.

All road users should be treated with respect. Cyclists in San Francisco are getting murdered left, right, and center, and the Government is failing to deal (indiscernible).  And I find this really disappointing, really disappointing in a country that my parents came to because they saw that the rule (indiscernible).  Thank you.

THE COURT:  All right.  Thank you.  We'll come back and I'll say more after we -- you know, after we continue with the proceedings.  I appreciate your remarks. Obviously, I can experience the stress that you've been under, and I can hear it in your voice, and it's palpable, and it sounds like you've had a very difficult time.

Just so you know a little bit about the process in federal court.  There's something called separation of powers.  And as I'm sitting here in the court, the Government gets to decide what charges to bring.  And so here what's -- what -- just so you know, because it may give you some understanding of the process, there are certain situations where the Court can weigh in as a matter of law on the decision about what charges to bring.  You can see

18

some of it from the current news cycle.  It has to be done appropriately.  The people with authority have to return the charges.  But the Government gets to -- and so, for example, in a different kind of a case, let's say a court thinks that the charge is too harsh and out of whack to what happened, the Government gets to decide what charges to bring. Separation of powers.  There's the executive branch, that's the Government here.  There's the court branch, the judicial branch.  And then there's the legislative branch, which is Congress.  And so my role is somewhat limited.  I have the ability to -- here, I can tell you that as a matter of law, there aren't any challenges to mount to the Government's decision to bring the CFR violations at -- that's at stake here and that the penalties that attach to that violation are a max of six months in prison and the five years of probation sort of boiled down.

And so I -- you know, I -- so I hear you on your frustration with the charge.  With the sentencing, I have some authority with, within the bounds of the statute.  But, really, the separation of powers doctrine means I take the case as -- this case as charged.  And so while you made some very eloquent observations about what -- from your perspective, the unfairness of the resolution here, and I appreciate your making them, what I'm going to do now is move on to the entry of plea bit, and then we're going to

19

continue with the sentencing process.  So I'm going to sort of move over a little bit.  I was looking at the screen to try to give you a straight shot of me.

And so now that we have heard -- had that perspective from the victim, Mr. Freeman, to the charge of failure to report a motor vehicle accident in violation of 36 CFR Section 4.4(a), how do you -- how do you plead, guilty or not guilty?

THE DEFENDANT:  Guilty, your Honor.

THE COURT:  All right.  A not guilty plea.

I find that Mr. Freeman is fully competent and capable of entering an informed plea, that he's aware of the nature of the charges and the consequences of the guilty plea, that the guilty plea is knowing and voluntary and supported by an independent factual basis.  I accept the plea, and the Defendant is now adjudged guilty of the offense.

And so now we're going to move on.  Just give me a second.  I'm going to -- we'll just take a quick 30 seconds while I move on to -- so just give me a second.

So I -- Elaine, I am going to hand that back to you.  All right.  Just give me a second.  I guess you can get that back from Ms. (indiscernible).

All right.  So I have here -- I'm going to just move over to my sentencing script.  Just give me a second.  So the -- this case is -- remind me the date of the incident.

20

I just gave back the copy of the plea agreement.  What was the date of the incident?  It was 2022, correct?

MR. LAGRAMA:  April 30, 2022.

THE COURT:  Right.  It was in 2022, and now we're in November of 2025.  I have -- I obviously have in mind we just -- the information that was filed, familiar with the general facts of the case as reported by the parties both, you know, through these proceedings and in the supplemental information provided in the sentencing memoranda that the parties submitted.  I know that they submitted sort of fact context about what happened, what they know, what they don't know, what the disagreements were, what the report -- you know, the ultimate report that Mr. Freeman made to -- about the case, and then his conduct since, which has not involved any further violation.  So I have a general understanding. I think that based on the parties' proffers so far and the availability of the -- to make a further proffer at sentencing and just -- this is just a little bit.  So sometimes we refer it for the preparation of a pre-sentence report, but when someone's been on pre-trial supervision, it has been -- there's been a time period that -- from the date of the incident to the filing of the charges, to the entry of the plea -- the initial appearance on the charges was in 2024.  And we have a record of supervision that -- we have a record of conduct during the period of time since the

21

incident supplemented by the parties' proffers.  I find that given that circumstance, including the fact that it's a CFR violation in the Golden Gate National Recreation Area, I think that the -- I have sufficient information to proceed to sentencing without having the full PSR, pre-sentence report, from Probation.  So I think that we can proceed to sentencing today.

And so I think what we'll do -- first, this is not a guidelines case, and I think we want to start first with -- I mean, I'm happy to have anyone go first.  I'm going to hear from whoever wants to go first about the reasons for the sentencing that you're asking for.  And then if we want to hear anything else from the victim, that's a possibility too.  But do you want to start with the Government?  You tell me.

MR. LAGRAMA:  Yes, your Honor.  I'll start.

First, I do apologize that Mr. Reimer doesn't agree with the Government's disposition in this case.  This is not something that we just made lightly.  There was a lot of consultation within our office.  I've had conversations with Mr. Reimer.  Mr. Reimer has talked to me through our victim services.  I have spoken to the investigators of this case. And so based on the law and on the facts as we understood it, we thought that this was the appropriate disposition.

There's just two things that I will say -- just three

22

more things, and I don't want this to divulge into, you know, any thought that this is victim blaming. But this is the first time I'm hearing about any allegation that Mr. Freeman did this to teach anyone a lesson. This is the first time I've heard about that.

Second, I -- this is also the first time that I've heard about the former prosecuting attorney promising jail time. I haven't heard of that before.

And with respect to victim blaming, I -- to the extent that that was communicated to someone else, that is hearsay. I am -- I was trying to explain to Mr. Reimer and also to the investigating agents our reason for why we thought -- our office collectively thought that this was the appropriate disposition, but that is not in any way to blame Mr. Reimer for what occurred. And I'll leave it at that, your Honor.

THE COURT: And, Elaine, can I get the plea agreement back, just so I have it? Thanks.

All right. Ms. Crepet, what would you like to offer?

MS. CREPET: I think a few things. First, some of the facts related by Mr. Reimer were also new to the Defense, including the assertion that Mr. Freeman rolled down his window and said, "You hit me." I think the records that Mr. Lagrama and I have reflect that he said, "Are you okay?" You know, Mr. Freeman is deeply sorry that this

23

incident obviously caused so much stress to Mr. Reimer, and we're sure Mr. Reimer would be thrilled to know that Mr. Freeman has really worked to change the course of his life. He is on -- taking classes online. He's working full time. He's a very responsible parent. His mother wrote a nice letter to the Court lauding the efforts he's made at getting himself together. And I think from a societal standpoint, that's the best we could hope for is that Mr. Freeman put himself in the best position possible to lead a law-abiding life. And over the course of the past more than two and a half years, he's done exactly that. So that's great.

And in terms of the -- all of the expenses to Mr. Reimer, you know, we're sorry to hear that you -- that you suffered and hope that there are remedies, you know, through civil processes that you can pursue or with insurers or, you know -- but that's a separate thing from kind of the criminal -- from the criminal aspect.

So, from Mr. Freeman's standpoint, the Defense position is that he has a demonstrated record now of rehabilitation that doesn't warrant the intervention of any kind of custodial sentence. He's worked very hard on himself to make sure that nothing like this happens again. And, again, the offense for which he's being sentenced is a failure to report an accident within a 24-hour period, which is not subject to the MVRA, and Mr. Lagrama did a lot of research

24

on that.

You know, also, the Defense -- we had a long process of negotiation with the Government, and the Government stood firm that conviction was appropriate.  So they were, you know, as thoughtful about this case as they would be about a felony.  And it was -- really, we had tremendous communication among the parties about this.

THE COURT:  Okay.  So, Mr. Reimer, is there anything else that you want to offer?  I mean, the -- what happens next is -- you did speak before the plea, but of course you have the right to be reasonably heard with respect to all stages of the case.  And this is a little bit different, even if it's the same day.  If there's anything else you wanted to add, I'm happy to hear it, then we'll hear from Mr. Freeman.

MR. REIMER:  Yes, thank you.  I would like to reply to some of the points here.  Point one is that Marcus said, "Are you okay?"  That's completely incorrect.  I'm not sure how this is the first time the Defense has heard this, because in my statement about the accident, I explicitly said that Marcus said, "You hit me," which is what happened.  And I find it a little bit crazy that someone would believe Marcus (indiscernible) he did report the car stolen.  So he is known to have -- you know, to have not good intentions during this case.  I don't know if you saw the picture of

25

the car.  My chest left a giant dent in this rental car. Like, you can see the imprint of my chest in the car.  And, you know, obviously, you can't return a car like that to a rental company and not have them question it.  So he reported it stolen in order to (indiscernible).

The second thing I would like to address with Lagrama is that he's talking about the (indiscernible) to require the charges.  There were multiple witnesses in this case. There were multiple witnesses.  That's how they -- that's how Marcus was caught, because I was the yelling, "Get the plates.  Get the plates."  One (indiscernible) behind me witnessed the whole thing, and a very nice Canadian couple that came to my rescue after the incident, they're the ones who got the plates, and they sent -- they saw him there.

With regards to what Lagrama has talked to me on the phone, he told me that it was okay that Marcus drove off because Marcus said I was threatening him.  I'm not a -- I'm five five, I'm a very short person, and I was on the ground, on my bicycle, bleeding.  I don't understand how someone sitting there bleeding on the ground after just being hit by a car is a threat to a person.  You know, I understand that people high on marijuana can get very paranoid and --

THE COURT:  Your volume just cut out somehow. Sorry, you cut out for a second there.  The last thing we heard was -- and then before you came back, you said, "I

26

understand that people high on marijuana can get paranoid," and then you cut out for a second.

MR. REIMER:  Yeah.  That people high on marijuana can get paranoid, so maybe (indiscernible) he thought that (indiscernible), but I don't see how a five five, 140-pound cyclist, standing there bleeding on the ground is a threat to anyone.  You know, at that point, I'm surprised (indiscernible).

MR. LAGRAMA:  Your Honor, I will say that I never said it was okay for Mr. Freeman to drive off.  I would never say such a thing.

THE COURT:  No, I -- so here's one of the good things about the -- everybody here, I can accept what everybody is saying.  So I -- from the victim's perspective, I completely accept what you're saying.  You were also injured, hurt.  A terrible thing happened, and you were left quite literally powerless at a time when a very bad thing happened.  I also recognize that you've described sort of ongoing -- you know, it's not an event that didn't continue to have ramifications for you.  And that puts you in a tough place, too.

MR. REIMER:  Your Honor, I no longer cycle because this is the second time I've been hit (indiscernible) no one uses -- no one uses the blinker.  Marcus did not use the blinker.  People driving cars like they own the road

(indiscernible).  You know, I have a car, I drive, I ride my bike, I walk, I run.  And in all these incidents, you know, people will have to respect the rights of the road (indiscernible).  On San Francisco, I was there last week for work, and I saw two hit-and-runs.

THE COURT:  Terrible.  Just random related, I have -- I'm somewhat aware of -- there's a San Francisco Bicycle Coalition.  You may be aware of it.  I've had a couple of cases on my civil docket involving injuries to cyclists.  I actually have experience in cases where people have been seriously injured with interactions, not just with motorists, but with impediments on the road.  And it's a tough -- you -- and you're right -- you're right, if people don't respect the road, that bad things can happen to people who aren't responsible.

MR. REIMER:  Yes.  Lucky that I actually had an excellent bike and I knew I was going to get into an accident.  I knew I had to brace for impact.  And since I was coming in horizontal on this car, I knew I had to (indiscernible).

THE COURT:  Yeah.

MR. REIMER:  Because, otherwise, my head would have gone through the driver's side window, and the glass would have cut me and may have potentially killed me.  He stopped right there (indiscernible).

28

THE COURT:  So thank you for providing that extra perspective.  You're right, your reflexes -- you're -- he is lucky, and you -- it's hard to think that you're lucky when you engage with an accident like this, but it is of some solace that your reflexes were so good that you were able to avoid more grievous harm, and I'm glad for that.

So now I think it's time.  Thank you for the remarks. And then I'll turn to, yeah, Mr. Freeman, and then I'll make my final remarks.

So, Mr. Freeman, it's now your opportunity to say anything that you would like to say to me before we move to my imposing the sentence.

THE DEFENDANT:  I just want to apologize, and I'm -- I'm really, really sorry.

THE COURT:  All right.  And then I -- so I don't know, were you able to hear that?  So he said that he wanted to apologize and said that he was very --

MR. REIMER:  Yes.  So, you know, I think he's only apologizing because he got caught and he's in court.  I do not accept his apology.  But, you know, maybe he's lucky that there's no assets to sue.  There isn't (indiscernible).

THE COURT:  Yeah.  It's -- that's the reality. You can't squeeze water from a stone and that if it is uninsured -- it's a really unfortunate set of circumstances, but you're quite right, if there's no possibility of

*Echo Reporting, Inc.*

29

recovery, yeah.

MR. REIMER:  My insurance rates have gone up because I (indiscernible) I have $10,000 (indiscernible) that wasn't covered.  I had to pay the lawyers $10,000. When Marcus says sorry, he should -- he should make reparations and make this right.  A lot of people talk about a restorative justice.  In my view, restorative justice means to make the victim whole and make the victim as if the accident never happened.  My heart condition is permanent. Marcus cannot change that, but he can pay for the costs. And if he's truly sorry, he will make an effort to do that. But I have seen no effort for that, neither his or his mother.  His mother first said that she would pay for my bicycle.  The NPS detective (indiscernible) bicycle and my total property damage as $20,000.  And then she goes, "I can't pay that.  I'm on disability."

THE COURT:  All right.  It's -- you know, another -- one of the things I often think about my job is I have very little ability to do things that make people's lives meaningfully better.  It's -- I -- those people who have heard me in civil litigation, I say it's -- whether it's civil or criminal, I'm in a misery business.  No one comes to see me in a happy place.  The system has a limited ability to afford recompense, and you pointed to the issue, precisely.  Money can help, but if there's no money to

30

provide, the Court -- and this is a -- the charge that was -- the charge here is not a victim -- I mean, even though the Government has engaged through its victim witness program with you and you have the statutory right as a victim to participate in the proceedings, the nature of the charge gives me limited ability to do anything.  And the reality, as you described, is that, you know, Mr. Freeman is judgment-proof.

So I -- but I recognize what you said under -- that to really -- you know, in life it's complicated.  You know, this is to Mr. Freeman.  I say it a lot to people who come to my court, you don't have nine lives.  What you have done is done something different for the past three and a half years than you were doing before.  And I know that probably does not give very much solace to a victim, but when the courts -- when we consider what the purpose of punishment is, what I am looking at is a case with a maximum of five years probation or six months imprisonment in a case that's three and a half years later with somebody who is -- the record from the Pretrial -- for the pre-conviction landscape suggests rehabilitation.  In a way, the Court in considering the purposes -- I -- no, I understand this is frustrating, from the victim's perspective, but under the sentencing statute, the Court looks at the need to reflect the seriousness of the offense, promote respect for the law,

31

provide just punishment or deterrence, protect the public from further crimes, and provide the defendant with sort of rehabilitational support in the form of training or correctional treatment.  I have very limited options that are available to me, up to six months in custody or a probationary period of time.  Given the parties' recommendation in the three and a half years since the event, I do think that a period of supervision of one year, which is the -- of one year's probation, which is the agreed-to sentence by the parties, will provide the additional framework for the Court to ensure the safety of the community and ongoing rehabilitative efforts.

You know, just so Mr. Freeman knows that if you violate the terms of your probation, that the probation can be revoked, and you could go back to the status quo.  It could be up to six months in custody and up to five years of -- and/or five years of probation.  So given that there have been three and a half years so far, I'm willing to continue the supervision for another year to ensure the safety of the community, with the understanding that if there -- and I do appreciate the victim's -- I do appreciate your perspective. As I've said, I think this is the sentence under the -- that I'm going to impose considering the factors in the sentencing statute.

So it is the judgment of the Court that -- and I know

32

-- Elaine just gave it to me.  It is the judgment of the Court that you're sentenced to a term of probation for a year.  While on supervision, you're subject to the mandatory conditions of supervision, which include that you not commit another federal, state, or local crime, you not unlawfully possess a controlled substance, you refrain from the -- any unlawful use of a controlled substance, submitting to a drug test within 15 days or -- and at least two periodic drug tests thereafter.

MS. CREPET:  We would ask that that condition, your Honor, be suspended in light of the fact that there isn't a nexus between that and the events, and there isn't --

THE COURT:  Oh, there is.

MS. CREPET:  Well --

THE COURT:  There is.  The allegation is that he was -- when it happened, that his behavior can be explained by the presence of marijuana.

MS. CREPET:  That's a fair point.  I mean, that's an allegation.  He certainly didn't plead to anything related to that, but --

THE COURT:  No, I understand.  But I am able to consider the nature and circumstances --

MS. CREPET:  True.

THE COURT:  -- of the offense.  And then -- I

33

mean, the -- so these are the mandatory conditions, and they're the standard conditions of supervision.  I mean, is the contemplation that he has supervised -- that he's on supervision by Probation?

MR. LAGRAMA:  Yes, your Honor.

But what our understanding is from Probation is they will determine the level by which they need to supervise him.  So they will properly --

THE COURT:  So just -- from the victim's perspective, just so you know, here's the thing, just -- I'll just explain it so everybody knows what's going on.  I'm going to do -- there'll be -- the references to Probation, it's -- so we'll talk about this in a second.  The references to Probation for supervision, what they do -- and I know that is -- from a victim's perspective, I hear you.  You think that the charge that was filed by the Government isn't enough.  The Government files its charges.  I am constrained by that charge, and I'm also constrained by the need -- the most important thing for the Court is to prevent recidivism, prevent it from happening again, and make sure somebody has the -- this is the way -- this is like the new -- the way we approach sentencing these days and the way we approach supervision.  The -- and you've talked about restorative justice.  I'm a big proponent of it.  I think in the end, if you're going to -- and I think

34

that Mr. Freeman has done a good job to try to do something different with his life, to be a responsible parent, to work full time, and to do something better than he was doing before, and he's done that for three and a half years. Probation supervises people with an eye towards promoting rehabilitation, because the best way to ensure that something doesn't happen again is to make sure somebody boil down, gets a job, stops drinking and driving and smoking pot in the car. Some people won't do DUIs who are very prominent defense lawyers because they think getting high or getting drunk and getting into a car, which is a bad, bad, bad idea is like shooting a gun into a crowd. And so that is the experience that Mr. (indiscernible) is having today because he was the victim there. I can tell you that the Court's approach to sentencing is consistent with the Government's, given the period of time. I will just impose the mandatory conditions of supervision for now. The -- that --

            MR. REIMER:  Your Honor --

            THE COURT:  -- yes.

            MR. REIMER:  -- may I ask a quick question?

            THE COURT:  Sure.

            MR. REIMER:  So, in California, it is required that drivers have insurance, and I understand that at this rate (indiscernible) very hard time getting insurance, but

35

will his probation ensure that he has insurance, for example, when you go and register --

THE COURT:  Yes.  Yes.  I mean, he can't commit another federal, state, or local crime.  He can't violate the law.  He's probably not going to go to jail for not having insurance if he drives, but it would be a violation of his supervision.  And what he knows is he can't drive a car without insurance.

MS. CREPET:  He also doesn't drive.

THE COURT:  And he doesn't drive anymore, apparently.

MR. REIMER:  (Indiscernible).

THE COURT:  Well, that's -- and so I would just say that three and a half years ago, this happened.  Where someone was three and a half years ago does not necessarily mean that that's where they are now.  I can tell you that with our probation department, one of the -- we do some things well and some things not so well.  But one of the things our federal probation department does is it supervises people with an idea towards promoting community safety and avoiding the same kind of thing happening again.  So Probation will look at these factors and -- you know, here's what happens with people with -- who don't have licenses.  Sometimes, people go to driving programs.  Sometimes, they get their driver's licenses back.  In order

36

to be able to register a vehicle, you have to have insurance.  There are programs that Probation has, for example, designed to give people --

MR. REIMER:  (Indiscernible).

THE COURT:  I think we do.  I just registered my -- I just registered my car, and I think that they did ask me to provide proof of insurance.  But I could be wrong.  But I hear you.  Supervision -- unlike state court where supervision is pretty perfunctory, people here try to look at the whole situation and try to impose conditions.  I'm not -- I'm going to let Probation make that assessment, to Ms. Crepet's point.  I'll let Probation make --

MR. REIMER:  (Indiscernible).

THE COURT:  My understanding is I don't have the -- I don't have the mechanism under this charge.  The Government filed to impose it.  You are suggesting a moral responsibility to do something, and I'm going to ask Mr. Freeman to think about that and talk about it with Ms. Crepet, because you're right, you're right.

MR. REIMER:  And if it's within your powers, then I would like you (indiscernible).

THE COURT:  Well, technically, I can't.  So I mean, I can -- it -- there's a -- it's a B agreement and the Government gets to charge what it wants to charge, and then I can either say -- I can reject it, which means the

37

Government could decide not to pursue any charges at all. That's usually what happens. If I could reject it, which I don't think I can because it's a C agreement, I -- usually, what happens is I can't -- it's the Government's decision what to charge. When you accept a plea, reject a plea, or oppose a different sentence, literally the only thing I can do that's different here is I could oppose more of a period of supervision, like more than a year, or I could oppose up to six months. I can't do six months and probation. It's one or the other. So when I look at community safety issues, what I think is, I think you're right, you don't want people on the road driving cars without licenses or without insurance. My best way of ensuring that Mr. Freeman has a solid path, which he may already have constructed all by himself in the three and a half years since the accident, the best thing I can do to protect the community going forward is to make sure everything is in place on a going forward basis. And if it's not, we'll be back here to address any violations.

MR. REIMER: Your Honor, for the record, I don't necessarily agree with you. Maybe six months is a little long, but, you know, I would think that, like, two to three months would (indiscernible) him using a car.

THE COURT: And I appreciate the perspective. You're not wrong. I understand that that can seem -- that

38

can seem -- when I look at -- and punishment is part of the sentence.  My view under the circumstances that I see here in front of me today, which I've already imposed sentence, is that the period of supervision will allow the Court to revisit that issue if something bad happens, which risks up to six months in prison.  And then my view is the interest -- is the interest of the community are best served by ensuring a continued rehabilitative path that's been demonstrated by the three and a half years.  I appreciate that you disagree.  I've done -- I've done the best I can to make a record of your perspective, and that is the judgment of the Court.

MR. REIMER:  You know, I've been run over twice on my bicycle (indiscernible).

THE COURT:  It's not -- I appreciate that this does not feel like a good position for you to be in.

MR. REIMER:  Your Honor, a little about my background.  I grew up in the Middle East.  My dad (indiscernible).  I've have been around, you know, various justice systems.  I've also seen, you know, countries that have very low crime rates, how they (indiscernible).

THE COURT:  I think -- well, the interesting thing -- well, again, this is (indiscernible), but I hear you. And, you know, one of the -- one of the issues about the American justice system is it's imperfect.  I'm not saying

it's perfect.  I do think that it has right-minded people in it, and mostly -- I have a joke that I say, which is not great.  Maybe it's not -- I say, "Usually, people try to do a good job.  It doesn't mean that they always do a good job."  I'm not saying that is happening here, but I understand the perspective.  I retain my optimism that people at the core are mostly good.  Not everybody.  Some people aren't.

MR. REIMER:  He's a repeat offender though (indiscernible) --

THE COURT:  I understand that.  Yeah, I hear you. And here's what I would offer just as a point of reference that I think about with the sentencing scheme -- and so how old is Mr. Freeman at this point?

MS. CREPET:  Thirty-eight.

MR. LAGRAMA:  Thirty-eight.

THE COURT:  Thirty-eight.  All right.  So I'll just be, like, really candid about all of this.  You're right.  People who commit crimes often tend to -- they can engage in repeat criminal behavior.  There is previous criminal behavior here, so you're right.  People do -- not everybody.  It sort of depends on the circumstances.  People do tend to age out of it.  It happens at -- usually in your thirties, sometimes earlier.  People sometimes have experiences where they decide, enough, and they do something

40

different.  What you're describing is a landscape which is completely fair.  When something bad -- when somebody does something bad, they should be punished.  And so that's completely a fair -- it's a retributive approach to justice, but you're correct, that is definitely -- that is one of the considerations.  Here, the primary driver for me is the issues of -- I care so much about community safety, and I completely think that incarceration often doesn't do much for people that kick the can down the road.  If there can be a therapeutic intervention at the right time in a case for somebody on -- pre-trial supervision is normally where we see it, because here's why.  You're presumed innocent until proven guilty.  So the nature of the offense and the evidence is the least important factor on pre-trial supervision, not convict -- post-conviction supervision.  And then what happens in those situations is someone has three and a half years, with a threat of a charge hanging over them or -- to do something about it and to do something different.  And so when you do, as a judge, have somebody come in front of you who has done all that can be expected of them in the three and a half years since this happened -- it is not to excuse what happened -- we do our best to say, "What's better?  How can I assure the harm to the victim is addressed?"  I can't.  If I could impose -- I think -- you know, the restitution piece of it is important.  I think

41

your point about the moral significance of saying you're sorry, and actually not just saying it, but doing something about it, trying to make it right, super important.  We just started restorative justice circle in federal court just this year, and we're doing four of them next year.  And you're right, the way to heal is by not being us and them, just being us, being a community and trying to do something different going forward.  It is not easy to make the right call.  You're right.  I'm not telling you you're wrong.  I'm telling you that you're right and -- as they say in mediation and (indiscernible) -- and I look at the circumstances in front of me, and I'm giving Mr. Freeman the opportunity to do something to continue on the path that he's on.  If he's successful, I'm confident that the needs of the community will be addressed.  If he's not successful, and you were right at the end of the day, there will be an opportunity to do something about it.

I really appreciate everybody's tolerance for the process.  I do have another calendar that I'm --

Elaine, will you tell them I'm -- my 11:30 that I'm on my way, and I'll see them on the other Zoom.

And thank you, everybody, for your participation today. We're now -- that concludes today's proceedings.

MR. LAGRAMA:  Thank you, your Honor.

MS. CREPET:  Thank you, your Honor.

42

(Proceedings adjourned at 11:45 a.m.)

43

CERTIFICATE OF TRANSCRIBER


    I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

    I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.


              Echo Reporting, Inc., Transcriber

                 Monday, December 22, 2025